Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Lauren Chase (Bar No. 324162)
Email: lauren@coastkeeper.org
ORANGE COUNTY COASTKEEPER &
INLAND EMPIRE WATERKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiffs Inland Empire Waterkeeper
& Orange County Coastkeeper*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of Orange County Coastkeeper, and ORANGE COUNTY COASTKEEPER, a California non-profit corporation;<br><br>    Plaintiffs,<br><br>  v.<br><br>CMC STEEL FABRICATORS, INC.; COMMERCIAL METALS COMPANY, a Delaware corporation; GERDAU REINFORCING STEEL<br><br>    Defendants. | Civil Case No. 8:21-cv-00236<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

  Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeepers" or "Plaintiffs"), by and through counsel, hereby allege:

## I.  JURISDICTION AND VENUE

  1.  Plaintiffs bring this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On December 4, 2020, Plaintiffs issued a 60-day Notice of Violation

and Intent To Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and incorporated by reference herein, to Commercial Metals Company ("CMC") and Gerdau Reinforcing Steel ("Gerdau"), which entity is later known as CMC Rebar West and, as of January 1, 2021, merged with CMC Steel Fabricators, Inc. (collectively with CMC and Gerdau, "Defendants"). The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ*) (hereinafter and as amended, the "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 5425 North Industrial Parkway, San Bernardino, California 92407 (the "Facility"). The Notice Letter informed Defendants of Plaintiffs' intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.     The Notice Letter was also sent to the registered agent for CMC, the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.     More than sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA, USDOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5.      Plaintiffs seek relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.      <u>INTRODUCTION</u>

6.      This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from their industrial operations at the Facility. Specifically, Defendants' discharges of pollutants from the Facility which enter the County of San Bernardino and City of San Bernardino storm drain system (collectively, "municipal separate storm sewer system" or "MS4"), which flows to Cable Creek, Devil Creek Diversion Channel, Cajon Wash, and Lytle Creek, which flows into the Santa Ana River and Prado Wetlands to its terminus at the Pacific Ocean (collectively referred to as the "Receiving Waters") in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring for at least five years from the date of the Notice Letter and are ongoing and continuous.

7.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the

surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III.    PARTIES

### A. Inland Empire Waterkeeper and Orange County Coastkeeper.

8.     Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

9.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

10.     Together Inland Empire Waterkeeper and Orange County Coastkeeper (together, "Waterkeepers") have approximately over 1,400 members who live and/or recreate in and around the Santa Ana River watershed. Waterkeepers are dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Waterkeepers actively seek federal and state agency implementation of the Clean Water Act and, where necessary, directly initiate enforcement actions on behalf of themselves, their members, and others.

11.     Waterkeepers' members use and enjoy the Santa Ana River watershed and its tributaries for fishing, boating, swimming, bird watching, picnicking, wading, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, including monitoring and research activities, and/or for aesthetic enjoyment.

12.     Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited, to discharges of polluted storm water from the Facility and failure to report such pollution, and act in accordance with the Storm Water Permit to improve the quality of

storm water discharges from the Facility, degrade water quality and harm aquatic life in the Santa Ana River watershed and its tributaries, and impair Waterkeepers' members' use and enjoyment of those waters, giving Waterkeeper standing on behalf of its members.

13. The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Waterkeepers' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Waterkeepers' members caused by Defendants' activities.

14. Continuing commission of the acts and omissions alleged herein will irreparably harm Waterkeepers' members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owners and/or Operators of the Facility.**

15. Plaintiffs are informed and believe, and thereon allege, that CMC is an active Delaware Corporation registered and authorized to do business in California.

16. Plaintiffs are informed and believe, and thereon allege, that Gerdau is an operator of the Facility.

17. Plaintiffs are informed and believe, and thereon allege, that Gerdau has been operating the Facility for the past five years.

18. Plaintiffs are informed and believe, and thereon allege, that Gerdau has been an owner of the Facility for the past five years.

19. Plaintiffs are informed and believe, and thereon allege, that CMC is an owner of Gerdau.

20. Plaintiffs are informed and believe, and thereon allege, that at some point Gerdau became known as CMC Rebar West, which merged into CMC Steel Fabricators, Inc. after Plaintiffs sent the Notice Letter.

21. Plaintiffs are informed and believe, and thereon allege, that the name and address of the Registered Agent for CMC is CT Corporation System located at 818 West Seventh St., Suite 930, Los Angeles, CA 90017.

22.     Plaintiffs refer to Defendants herein as the "Owners and/or Operators" of the Facility.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

23.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

24.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

25.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

26.     The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

27.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

28.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

29.     The Clean Water Act confers jurisdiction over waters that are tributaries to

traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

30.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

31.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

32.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

33.     Defendants are each a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

34.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

35.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $58,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

36.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

///

**B.    California's Storm Water Permit.**

37.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

38.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

39.    California is a state authorized by EPA to issue NPDES permits.

40.    In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

41.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

42.    The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

43.    On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

44.    In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit,

Finding 17.

45.    Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section XXI(A) (Duty to Comply).

**C.    The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

46.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* Storm Water Permit, Discharge Prohibition III(B).

47.    The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH. *See* Storm Water Permit, Section V(A).

48.    Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

49.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the Storm Water Permit via the Table 2 Numeric Action Levels ("NALs").*See* Storm Water Permit, Monitoring, Sampling and Analysis, XI(B).

50.    The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008);

MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

51.    The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); TSS – 100 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

52.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility. *Id.*

53.    The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* Storm Water Permit, Section VI(B).

54.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the Storm Water Permit.

55.    The Storm Water Permit's Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards. *See* Storm Water Permit, Receiving Water Limitation VI(A).

56.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

57.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan (a "Basin Plan") that contains WQS for water bodies within its geographical area.

58.    WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R.

§ 131.38 ("CTR"), and water quality objectives in the Basin Plan.

59.    The Basin Plan for the Santa Ana River Basin, California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Santa Ana Basin Plan") identifies the "Beneficial Uses" of water bodies in the Santa Ana region.

60.    Cable Creek flows to Devil Creek Diversion Channel, which connects to Cajon Creek, which joins Lytle Creek, which discharges to Reach 4 of the Santa Ana River, which continues through Prado Wetlands and Reaches 1-3 of the Santa Ana River, ultimately discharging to the Pacific Ocean. The Beneficial Uses of the Reaches 1-4 of the Santa Ana River include: Groundwater Recharge; Water Contact Recreation; Non-contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species.  *See* Santa Ana Basin Plan at Table 3-1.

61.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

62.    According to the 2014/2016 303(d) List of Impaired Water Bodies, Santa Ana River, Reach 3 is impaired for copper and lead, and Prado Wetlands are impaired for pH.

63.    Polluted discharges from industrial sites, such as the Facility which discharges pH-affecting substances; metals, such as iron, nickel, aluminum; toxic metals, such as zinc and copper; TSS; and N+N, each of which causes or contributes to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

64.    Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

65.    The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

66.    The Santa Ana Basin Plan includes a toxicity standard which states that "[t]he concentrations of toxic substances in the water column, sediments or biota shall not

adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

67.    Further, the Santa Ana Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *See* Santa Ana Basin Plan 4-20.

68.    The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

69.    Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI(A) of the Storm Water Permit.

**D.    The Storm Water Permit Storm Water Pollution Prevention Plan Requirements.**

70.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

71.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-

generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

72. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

73. The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section XV.

74. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).

///

---

Complaint                                  13                        Civil Case No. 8:21-cv-00236

**E.    The Storm Water Permit Monitoring Implementation Program Requirements.**

75.    The Storm Water Permit requires permittees to develop and implement storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections X(I) and XI.

76.    The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section XI. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

77.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. Storm Water Permit, Section XI(B).

78.    Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations of each drainage area.

79.    Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct sampling event visual observations, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3).

80.    The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

81.    The Storm Water Permit requires dischargers to visually observe and collect

samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

82.    Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as  a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

83.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

84.    Section XI(B)(11) of the Storm Water Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

85.    Section XI(B)(6)(a)-(b) of the Storm Water Permit requires dischargers to analyze samples for TSS, O&G, and pH, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the Standard Industrial Classification ("SIC") code.

86.    Table 1 of the Storm Water Permit requires dischargers with SIC code 3449, such as the Facility, to analyze samples for zinc, N+N, iron, and aluminum.

87.    Section XI(B)(6)(c) of the Storm Water Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

88.    Section XI(B)(6)(f) of the Storm Water Permit requires dischargers to analyze additional parameters required by the Regional Board.

89.    Section XI(B)(6) of the Storm Water Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

90.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**F.     The Storm Water Permit Exceedance Response Actions Requirements.**

91.     Upon receiving NOI coverage, all permittees are deemed in "Baseline status." See Storm Water Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

92.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit, Section XII(C)(1)(a)-(c).

93.     Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

94.     Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report

prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

95.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

96.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

97.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D).

98.    A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, Storm Water Permit, Section XII(D).

## V.    FACTUAL BACKGROUND

### A.    The Facility's Storm Water Permit Coverage.

99.    In order for the Facility to lawfully discharge pollutants to waters of the United States, the Facility Owners and/or Operators were required to obtain an NPDES Permit and comply with its terms.

100.    Plaintiffs are informed and believe, and thereon allege, that on or about June

12, 2015, CMC and/or Gerdau obtained Storm Water Permit coverage for the Facility by submitting an NOI to the State Board.

101. Plaintiffs are informed and believe, and thereon allege, that in the NOI, the Facility Owners and/or Operators identified the operator of the Facility as "Gerdau Reinforcing Steel" located at 3880 Murphy Canyon Road, Suite 100, San Diego, California 92123.

102. Plaintiffs are informed and believe, and thereon allege, that in the NOI, the Facility Owners and/or Operators identified the site name of the Facility as "Commercial Metals Company."

103. The NOI lists the Facility as 11.1 acres in size with 9 acres of industrial area exposed to storm water.

104. The NOI states that the Facility is 85% impervious.

105. The State Board's electronic SMARTS database, lists the current Facility Waste Discharge Identification ("WDID") number as 8 36I024843.

106. SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

107. The NOI lists the SIC code for the Facility as 3449 (Miscellaneous Structural Metal Work).

**B.    Description of Industrial Activities at the Facilities.**

108. Plaintiffs are informed and believe, and thereon allege, that the Facility is a steel fabrication facility.

109. Plaintiffs are informed and believe, and thereon allege, that the Facility fabricates structural steel rods, where welding, cutting, and drilling takes place.

110. Plaintiffs are informed and believe, and thereon allege, that pollutants associated with operations at the Facility include, but are not limited to: metals (including zinc, copper, aluminum, nickel, lead, and iron; fuels; other solvents; oil and grease; and other pH-affecting substances).

111. Plaintiffs are informed and believe, and thereon allege, that a portion of the

Facility is used by Defendants for materials storage and parking.

112. Plaintiffs are informed and believe, and thereon allege, that large lengths of industrial steel are stored outdoors, uncovered.

113. Plaintiffs are informed and believe, and thereon allege, that the Facility lacks adequate cover for its steel to prevent storm water and non-storm water exposure to pollutant sources.

114. Plaintiffs are informed and believe, and thereon allege, that the Facility also handles, uses and stores diesel exhaust fluid, lubricating and hydraulic oils and welding supplies.

115. Plaintiffs are informed and believe, and thereon allege, that the storage and maintenance of vehicles and equipment, storage of materials, and industrial activities occur outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

116. Plaintiffs are informed and believe, and thereon allege, that trucks and vehicles on-site track sediment, dirt, fugitive dust, oil and grease, metal particles, and other pollutants off-site.

117. Plaintiffs are informed and believe, and thereon allege, the Facility's Owners' and/or Operators' failures to develop and/or implement required BMPs result in the exposure of pollutants associated with their industrial activities to precipitation, and result in the Facility's discharge of polluted storm water into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

118. Plaintiffs are informed and believe, and thereon allege, that the activities and/or areas listed in paragraphs 108-116 are industrial activities and/or areas of industrial activity at the Facilities.

///

///

**C.    Defendants' SWPPP for the Facility.**

119.    The SWPPP, which includes the MIP, is publicly available for the Facility via the SMARTS database and is dated March 25, 2016, last revised January 30, 2017.

120.    Plaintiffs are informed and believe, and thereon allege, that the SWPPP referenced in paragraph 119 is the current SWPPP for the Facility.

**D.    Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Facility.**

121.    Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas of industrial activity are sources of pollutants at the Facility.

122.    Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas at the Facility include, but are not limited to the activities described in paragraphs 108-116.

123.    SWPPP Sections entitled: "Facility Information," and "Description of Potential Sources of Pollution" provide brief descriptions of the areas where industrial activities are conducted at the Facility.

124.    Plaintiffs are informed and believe, and thereon allege, that the SWPPP for the Facility does not adequately describe all industrial processes at the Facility.

125.    Plaintiffs are informed and believe, and thereon allege, that a site map  ("Site Map") was uploaded to SMARTS on July 1, 2015, and that the Site Map is a map of the Facility submitted pursuant to Section II(B)(3)(a) of the Storm Water Permit.

126.    Plaintiffs are informed and believe, and thereon allege, that industrial activities occur throughout the Facility outdoors without adequate cover to prevent storm water exposure to pollutant sources.

127.    Plaintiffs are informed and believe, and thereon allege, that because the Facility's SWPPP fails to describe all of the industrial activities, the Facility's SWPPP also fails to describe all of the significant materials and processes that are related to the industrial activities at the Facility.

128.    Plaintiffs are informed and believe, and thereon allege, that because all

significant materials have not been identified, the Facility's SWPPP fails to describe the locations where the materials are stored, received, shipped, and handled, or the typical quantities and frequency of significant materials at the Facility.

129.    The Facility's SWPPP section entitled "Description of Potential Sources of Pollution," identifies potential pollutants associated with the industrial activities at the Facility

130.    Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe all of the pollutants associated with the industrial activities at the Facility.

131.    Plaintiffs are informed and believe, and thereon allege, that the Owners and/or Operators of the Facility have failed and continue to fail to adequately assess pollutants associated with potential pollutant sources at the Facility.

132.    Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP does not include an adequate assessment of pollutants associated with potential pollutant sources at the Facility.

133.    Plaintiffs are informed and believe, and thereon allege, that pollutants associated with industrial activities and areas the Facility include, but are not limited to: pH-affecting substances; metals, such as iron, nickel, and aluminum; toxic metals, such as zinc and copper; TSS; N+N; gasoline, diesel and fuel additives; spent solvents; and, oil and grease.

134.    The Facility's SWPPP sections entitled: "Minimum BMPs" and "Advanced BMPs" identify the BMPs for the areas of industrial activity at the Facility.

135.    The Facility's SWPPP section entitled: "Description of Potential Sources of Pollution" includes a brief assessment of "Potential Pollutant Sources" at the Facility.

136.    Plaintiffs are informed and believe, and thereon allege, that the Facility's SWPPP fails to describe adequate BMPs to reduce or prevent pollutants in the discharges from the Facility.

137.    Plaintiffs are informed and believe, and thereon allege, that without properly

1  identifying all industrial activities at the Facility in the SWPPP, the Facility Owners and/or
2  Operators cannot and have not developed all appropriate BMPs.

3  138.   Plaintiffs are informed and believe, and thereon allege, that without properly
4  identifying all industrial activities at the Facility in the SWPPP, the Facility Owners and/or
5  Operators cannot and have not implemented all appropriate BMPs.

6  139.   Plaintiffs are informed and believe, and thereon allege, that without properly
7  identifying all significant materials at the Facility in the SWPPP, the Facility Owners
8  and/or Operators cannot and have not developed and/or implemented all appropriate
9  BMPs.

10  140.   Plaintiffs are informed and believe, and thereon allege, that the Facility's
11  SWPPP does not include an adequate assessment of potential pollutant sources at the
12  Facility.

13  141.   Plaintiffs are informed and believe, and thereon allege, that the Facility
14  Owners and/or Operators have failed and continue to fail to assess the BMPs at the Facility
15  corresponding to potential pollutant sources and associated pollutants.

16  142.   Plaintiffs are informed and believe, and thereon allege, that the Facility's
17  SWPPP does not include an adequate description or assessment of the BMPs at the Facility
18  corresponding to potential pollutant sources and associated pollutants.

19  143.   Plaintiffs are informed and believe, and thereon allege, that the Facility
20  Owners and/or Operators have failed and continue to fail to assess potential pollutant
21  sources at the Facility.

22  144.   Plaintiffs are informed and believe, and thereon allege, that the Facility
23  Owners and/or Operators have failed and continue to fail to analyze the effectiveness of
24  the BMPs at the Facility, and that the Facility's SWPPP does not include an adequate
25  analysis of the effectiveness of the BMPs at the Facility.

26  145.   Plaintiffs are informed and believe, and thereon allege, that storm water
27  sampling at the Facility demonstrates that the Facility's storm water discharges from the
28  Facility contain concentrations of pollutants above NALs, including, but not limited to:

pH, aluminum, iron, zinc, copper, N+N, and TSS.

146.    Plaintiffs are informed and believe, and thereon allege, that the repeated and significant exceedances of NALs demonstrates that the Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

147.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise the Facility's SWPPP.

**E.    Discharge Locations at the Facility.**

148.    The Facility Owners and/or Operators state that the Facility's industrial storm water discharges from four discharge locations, located along the western border of the Facility along Industrial Parkway.

149.    The attachment to the Facility's SWPPP identified as Appendix B is the Site Map. The Site Map illustrates the direction of flow from the east to the west and depicts the Facility's discharge locations with green triangles placed at five distinct numbered locations "1, 2, 3, 3, and 4."

150.    Plaintiffs are informed and believe, and thereon allege, that there are more than four discharge locations at the Facility.

151.    Specifically, Plaintiffs are informed and believe, and thereon allege, that the two discharge points, both identified as "3" represent discharge from two distinct drainage areas.

152.    Plaintiffs are informed and believe, and thereon allege, that there are additional discharge points not identified on the Site Map.

**F.    The Discharges from the Facility to the Receiving Waters.**

153.    Plaintiffs are informed and believe, and thereon allege, that the storm water discharging from the Facility flows into the MS4.

154.    Plaintiffs are informed and believe, and thereon allege, that the polluted storm

water from the Facility discharges from the MS4 into Cable Creek, which flows into Devil

Creek Diversion Channel, which flows into Cajon Creek, which joins Lytle Creek, which

empties into Reach 4 of the Santa Ana River and continues on through the Prado Wetlands

and the remaining downstream reaches of the Santa Ana River.

155.   Plaintiffs are informed and believe, and thereon allege, that the polluted storm

water from the Facility discharges from the Santa Ana River to the Pacific Ocean at

Huntington Beach State Beach.

156.   Plaintiffs are informed and believe, and thereon allege, that each of the

receiving waters described in paragraphs 154 and 155 are waters of the United States.

### G.   Defendants' Monitoring Implementation Plan.

157.   The Facility's SWPPP section entitled: "Monitoring Implementation Plan"

discusses the Facility's MIP. Plaintiffs are informed and believe, and thereon allege, that

the Facility Owners and/or Operators have failed and continue to fail to conduct and record

adequate visual observations of storm water discharges since Facility obtained permit

coverage on or about June 12, 2015.

158.   Plaintiffs are informed and believe, and thereon allege, that the Facility

Owners and/or Operators have failed and continue to fail to conduct and record all required

monthly visual observations at the Facility.

159.   The Facility's SWPPP section entitled Monitoring Implementation Plan

constitutes the "Sampling Program" for the Facility.

160.   The SWPPP Monitoring Program section identifies O&G, TSS, pH, zinc,

N+N, iron and aluminum as the sampling requirements at the Facility.

161.   Plaintiffs are informed and believe, and thereon allege, that the industrial

activities at the Facility result in the discharge of storm water containing copper to

receiving waters impaired for copper, contributing to the degradation of water quality.

162.   Plaintiffs are informed and believe, and thereon allege, that the Facility's

SWPPP fails to require that the Facility Owners and/or Operators analyze storm water

discharges from the Facility for all required parameters by failing to specify that storm

1  water discharges will be analyzed for copper.

2      163.    Plaintiffs are informed and believe, and thereon allege, that the MIP for the

3  Facility fails to that require the Facility Owners and/or Operators collect storm water

4  samples from all discharge locations at the Facility from all storm water discharges

5  occurring during QSEs.

6      164.    Via the SMARTs database, Plaintiffs obtained an Annual Report for the

7  Facility dated July 14, 2016.

8      165.    Plaintiffs are informed and believe, and thereon allege, that the Annual Report

9  dated July 14, 2016, obtained from the Regional Board is the 2015/2016 Annual Report for

10 the Facility.

11     166.    Via the SMARTS database, Plaintiff obtained an Annual Report for the

12 Facility dated June 29, 2017.

13     167.    Plaintiffs are informed and believe, and thereon allege, that the Annual Report

14 dated June 29, 2017, obtained from the Regional Board is the 2016/2017 Annual Report

15 for the Facility.

16     168.    Via the SMARTS database, Plaintiff obtained an Annual Report for the

17 Facility dated July 10, 2018.

18     169.    Plaintiffs are informed and believe, and thereon allege, that the Annual Report

19 dated July 10, 2018, obtained from the Regional Board is the 2017/2018 Annual Report for

20 the Facility.

21     170.    Via the SMARTS database, Plaintiff obtained an Annual Report for the

22 Facility dated June 30, 2019.

23     171.    Plaintiffs are informed and believe, and thereon allege, that the Annual Report

24 dated June 30, 2019, obtained from the Regional Board is the 2018/2019 Annual Report

25 for the Facility.

26     172.    Via the SMARTS database, Plaintiff obtained an Annual Report for the

27 Facility dated July 15, 2020.

28     173.    Plaintiffs are informed and believe, and thereon allege, that the Annual Report

1  dated July 15, 2020, obtained from the Regional Board is the 2019/2020 Annual Report for
2  the Facility.

3      2015/2016 Reporting Year

4      174.    Plaintiffs are informed and believe, and thereon allege, that the presence of
5  high concentrations of pollutants above NALs in the samples collected during the
6  2015/2016 reporting year demonstrate that the Facility's BMPs did not and continue to not
7  adequately address existing potential pollutant sources.

8      175.    Plaintiffs are informed and believe, and thereon allege, that the Facility
9  Owners and/or Operators failed to analyze storm water samples for all required parameters,
10 including pollutants likely to be present in the Facility's storm water discharges in
11 significant quantities, such as copper during the 2015/2016 reporting year.

12     176.    Plaintiffs are informed and believe, and there on allege, that the Facility
13 Owners and/or Operators failed to conduct and/or record all monthly visual observations
14 during the 2015/2016 reporting year.

15     177.    Plaintiffs are informed and believe, and there on allege, that the Facility
16 Owners and/or Operators failed to conduct and/or record all storm water visual
17 observations during the 2015/2016 reporting year.

18     178.    Plaintiffs are informed and believe, and there on allege, that the Facility
19 Owners and/or Operators certified that the Facility was in compliance with the Storm Water
20 Permit in its 2015/2016 Annual Report.

21     179.    Plaintiffs are informed and believe, and thereon allege, that the Facility
22 Owners and/or Operators failed to describe instances of noncompliance with the Storm
23 Water Permit at the Facility in its 2015/2016 Annual Report.

24     180.    Plaintiffs are informed and believe, and thereon allege, that the Facility
25 Owners and/or Operators' acts and omissions described in paragraphs 174-179 are
26 violations of the Clean Water Act's requirement that the discharger must be in compliance
27 with all terms of an NPDES permit that authorizes the lawful discharge of pollutants to
28 waters of the United States.

2016/2017 Reporting Year

181.   Plaintiffs are informed and believe, and thereon allege, that the presence of high concentrations of pollutants above NALs in the samples collected during the 2016/2017 reporting year demonstrate that the Facility's BMPs did not and continue to not adequately address existing potential pollutant sources.

182.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities, such as copper during the 2016/2017 reporting year.

183.   Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all monthly visual observations during the 2016/2017 reporting year.

184.   Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all storm water visual observations during the 2016/2017 reporting year.

185.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators entered Level 1 status for N+N, TSS, iron, aluminum, and pH based on the storm water sample collected in the 2015/2016 reporting year, but failed to prepare and/or submit to via SMARTS a Level 1 ERA evaluation and Level 1 ERA report for pH. Further, the Facility Owners and/or Operators failed to update the SWPPP to reflect the Level 1 status and describe additional BMPs for each parameter that exceeded an NAL.

186.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators certified that the Facility was in compliance with the Storm Water Permit in its 2016/2017 Annual Report.

187.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' certification of compliance in the 2016/2017 Annual Report was false because it failed to comply with each of the requirements of the Storm Water Permit.

188.   Plaintiffs are informed and believe, and thereon allege, that the Facility

Owners and/or Operators failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2016/2017 Annual Report.

189.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described in paragraphs 181-188 are violations of the Clean Water Act's requirement that the discharger must be in compliance with all terms of an NPDES permit that authorizes the lawful discharge of pollutants to waters of the United States.

2017/2018 Reporting Year

190.   Plaintiffs are informed and believe, and thereon allege, that the presence of high concentrations of pollutants above NALs in the samples collected during the 2017/2018 reporting year demonstrate that the Facility's BMPs did not and continue to not adequately address existing potential pollutant sources.

191.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators failed to analyze storm water samples for all required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities, such as copper during the 2017/2018 reporting year.

192.   Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to collect and/or analyze storm water samples from at least four QSEs during the 2017/2018 reporting year.

193.   Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all monthly visual observations during the 2017/2018 reporting year.

194.   Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all storm water visual observations during the 2017/2018 reporting year.

195.   Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators entered Level 2 status for N+N, iron, aluminum, and pH as demonstrated by the storm water samples collected during the 2016/2017 reporting year.

196.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to prepare and/or submit via SMARTS a Level 2 ERA Action Plan and Level 2 ERA Technical Report for N+N as required by the Storm Water Permit. Further, the Facility Owners and/or Operators failed to update the SWPPP to reflect the Level 2 status and describe additional BMPs for each parameter that exceeded an NAL.

197.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators certified that the Facility reduced the number of sampling locations in accordance with the Representative Sampling Reduction in Section XI.C.4 of the Storm Water Permit in its 2017/2018 Annual Report.  Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to provide the Representative Sampling Reduction justification as required by Section XI.C.4.b of the Storm Water Permit.

198.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators erroneously certified that the Facility was in compliance with the Storm Water Permit in its 2017/2018 Annual Report.

199.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' certification of compliance in the 2017/2018 Annual Report was false because it failed to comply with each of the requirements of the Storm Water Permit.

200.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2017/2018 Annual Report.

201.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described in paragraphs 190-200 are violations of the Clean Water Act's requirement that the discharger must be in compliance with all terms of an NPDES permit that authorizes the lawful discharge of pollutants to waters of the United States.

<u>2018/2019 Reporting Year</u>

202.    Plaintiffs are informed and believe, and there on allege, that the Facility

Owners and/or Operators failed to collect and/or analyze storm water samples from at least four QSEs during the 2018/2019 reporting year.

203. Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all monthly visual observations during the 2018/2019 reporting year.

204. Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all storm water visual observations during the 2018/2019 reporting year.

205. Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators never entered back into Baseline status for N+N, iron, aluminum, or pH during the 2017/2018 reporting year.

206. Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to update the SWPPP to reflect the Level 2 status and describe additional BMPs for each parameter that exceeded an NAL.

207. Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators erroneously certified that the Facility was in compliance with the Storm Water Permit in its 2018/2019 Annual Report.

208. Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' certification of compliance in the 2018/2019 Annual Report was false because it failed to comply with each of the requirements of the Storm Water Permit.

209. Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2018/2019 Annual Report.

210. Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described in paragraphs 202-209 are violations of the Clean Water Act's requirement that the discharger must be in compliance with all terms of an NPDES permit that authorizes the lawful discharge of pollutants to waters of the United States.

2019/2020 Reporting Year

211.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to collect and/or analyze storm water samples from at least four QSEs during the 2019/2020 reporting year.

212.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all monthly visual observations during the 2019/2020 reporting year.

213.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to conduct and/or record all storm water visual observations during the 2019/2020 reporting year.

214.    Plaintiffs are informed and believe, and there on allege, that the Facility never entered back into Baseline status for iron, aluminum, pH, or TSS during the 2019/2020 reporting year.

215.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators failed to update the SWPPP to reflect the Level 2 status and describe additional BMPs for each parameter that exceeded an NAL.

216.    Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described in paragraphs 211-215 are violations of the Clean Water Act's requirement that the discharger must be in compliance with all terms of an NPDES permit that authorizes the lawful discharge of pollutants to waters of the United States.

217.    Plaintiffs are informed and believe, and there on allege, that the Facility Owners and/or Operators are in continuous and ongoing violation of the terms of the Storm Water Permit described herein.

///

///

///

///

# VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

**(Alleged against all Defendants)**

218.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

219.   Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

220.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

221.   The Facility Owners and/or Operators violated, violate and will continue to violate the Storm Water Permit Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States from the Facility.

222.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

223.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

224.   Plaintiffs allege that their members have been harmed by the Facility Owners and/or Operators' acts and omissions described herein and have standing to bring this suit.

225.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

226.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 6, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

227.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

228.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

**(Alleged against all Defendants)**

229.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

230.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

231.   Plaintiffs are informed and believe, and thereon allege that, within the

applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge each time storm water discharges from the Facility.

232.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

233.   Plaintiffs allege that their members have been harmed by the Facility Owners and/or Operators' acts and omissions described herein and have standing to bring this suit.

234.   The Facility Owners and/or Operators violated, violate and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

235.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators violated and violate the Receiving Water Limitations of the Storm Water Permit and the CWA within the applicable statute of limitations, and such violations are ongoing and continuous.

236.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

237.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 6, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

238.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California,

1    for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

2         239.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3    an actual controversy exists as to the rights and other legal relations of the Parties.

4         WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth

5    hereafter.

6                              **THIRD CAUSE OF ACTION**

7             **Defendants' Failure to Adequately Develop, Implement, and/or**

8         **Revise a Storm Water Pollution Prevention Plan in Violation of the**

9                **Storm Water Permit and the Clean Water Act.**

10               **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

11                        **(Alleged against all Defendants)**

12        240.   Plaintiffs incorporate the allegations contained in the above paragraphs as

13   though fully set forth herein.

14        241.   Plaintiffs are informed and believe, and thereon allege, within the applicable

15   statute of limitations, that the Facility Owners and/or Operators have failed and continue

16   to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water

17   Permit.

18        242.   Plaintiffs are informed and believe, and thereon allege, within the applicable

19   statute of limitations, that the Facility Owners and/or Operators have failed and continue

20   to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water

21   Permit.

22        243.   Plaintiffs are informed and believe, and thereon allege, within the applicable

23   statute of limitations, that Facility Owners and/or Operators have failed and continue to fail

24   to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

25        244.   The Facility Owners and/or Operators have been in violation of the Storm

26   Water Permit at the Facility every day from December 6, 2015, to the present.

27        245.   The Facility Owners' and/or Operators' violations of the Storm Water Permit

28   and the CWA at the Facility are ongoing and continuous.

246.   The Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPPs for the Facility.

247.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

248.   Plaintiffs allege that their members have been harmed by the Facility Owners and/or Operators' acts and omissions described herein and have standing to bring this suit.

249.   Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

250.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 6, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

251.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

252.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

///

///

///

///

**FOURTH CAUSE OF ACTION**

**Defendants' Failure to Adequately Develop, Implement, and/or**

**Revise a Monitoring Implementation Program in Violation of the**

**Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

**(Alleged against all Defendants)**

253.  Plaintiffs incorporates the allegations contained in the above paragraphs as though fully set forth herein.

254.  Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

255.  Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the Storm Water Permit.

256.  Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

257.  The Facility Owners and/or Operators have been in violation of the Storm Water Permit monitoring requirements at the Facility every day from December 6, 2015 to the present.

258.  The Facility Owners' and/or Operators' violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

259.  The Facility Owners and/or Operators will continue to be in violation of Section XI of the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

260.  Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described herein constitute violations of

1  individual terms of the Storm Water Permit, compliance with which is required to lawfully
2  discharge pollutants to waters of the United States.

3       261.   Plaintiffs allege that their members have been harmed by the Facility Owners
4  and/or Operators' acts and omissions described herein and have standing to bring this suit.

5       262.   Each and every violation of the Storm Water Permit MIP requirements at the
6  Facility is a separate and distinct violation of the CWA.

7       263.   By committing the acts and omissions alleged above, the Facility Owners
8  and/or Operators are subject to an assessment of civil penalties for each and every violation
9  of the CWA occurring from December 6, 2015, to the present, pursuant to Sections 309(d)
10  and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

11       264.   An action for injunctive relief under the CWA is authorized by Section 505(a)
12  of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions
13  alleged above would irreparably harm Plaintiffs and the citizens of the State of California,
14  for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

15       265.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because
16  an actual controversy exists as to the rights and other legal relations of the Parties.

17       WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth
18  hereafter.

### FIFTH CAUSE OF ACTION

**Defendants' Failure to Report as Required by the Storm Water**

**Permit in Violation of the Storm Water Permit and the Clean**

**Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

**(Alleged against all Defendants)**

25       266.   Plaintiffs incorporate the allegations contained in the above paragraphs as
26  though fully set forth herein.

27       267.   Plaintiffs are informed and believe, and thereon allege, within the applicable
28  statute of limitations, that the Facility Owners and/or Operators' 2015/2016 Annual Report

fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

268.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators' 2016/2017 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

269.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators' 2017/2018 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

270.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators' 2018/2019 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

271.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators failed to submit a Level 1 ERA Report for pH in accordance with Section XII(C) of the Storm Water Permit.

272.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators failed to submit a Level 2 ERA Action Plan for N+N in accordance with Section XII(D) of the Storm Water Permit.

273.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators failed to submit a Level 2 ERA Technical Report for N+N in accordance with Section XII(D) of the Storm Water Permit.

274.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators failed to collect and report samples from all discharge locations in accordance with Section XI(B) of the Storm Water Permit since at least December 6, 2015.

275.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that the Facility Owners and/or Operators have failed to report samples to SMARTS within thirty (30) days of receipt in accordance with Section XI(B) of the Storm Water Permit since at least December 6, 2015.

276.  The Facility Owners and/or Operators have been in violation of Sections XI, XII, and XVI of the Storm Water Permit and the CWA every day since at least December 6, 2015.

277.  Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

278.  Plaintiffs allege that their members have been harmed by the Facility Owners and/or Operators' acts and omissions described herein and have standing to bring this suit.

279.  The Facility Owners and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

280.  By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 6, 2015, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

281.  An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

282.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against the Defendants as set forth hereafter.

## VII.  **RELIEF REQUESTED**

283.  Plaintiffs respectfully request that this Court grant the following relief:

a.    A Court order declaring the Defendants to have violated and are in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to

Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failure to develop and implement and adequate SWPPP, for failure to submit accurate annual reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit;

b.    A Court order enjoining Defendants from discharging pollutants in violation of an NPDES permit;

c.    A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.    A Court order assessing civil monetary penalties for each violation of the CWA at $58,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e.    A Court order awarding Plaintiffs their reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.    Any other relief as this Court may deem appropriate.

Dated: February 4, 2021                    Respectfully submitted,


By /s/ Lauren D. Chase
    Lauren D. Chase
    Attorney for Plaintiffs
    Inland Empire Waterkeeper
    Orange County Coastkeeper